# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JACQUALINE R. WEST,

      **Plaintiff** *pro se*,

vs.                                                   CIV 00-1267 JP/WWD

**CITY OF ALBUQUERQUE and**
**ALBUQUERQUE POLICE DEPARTMENT**
**OFFICERS, TERRE MOLANDER and**
**LOUIS BLACK, Individually, Jointly and**
**Severally,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

On August 16, 2001, the Defendants filed a motion for summary judgment (Doc. No. 41). After a careful review of the briefs and the relevant law, this Court has determined that the motion for summary judgment should be granted in part and denied in part.

I.    LEGAL STANDARD

A court should grant summary judgment only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Supreme Court has observed that a genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Initially, the moving party carries the burden of establishing that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the party opposing the motion, who must come forward with evidence, beyond mere allegations or denials of the

pleadings, which shows that a genuine issue of material fact exists. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). In deciding a motion for summary judgment, courts should "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l, Inc. v. First Affiliated §., Inc*, 912 F.2d 1238, 1241 (10th Cir. 1990).

In their Reply to the Plaintiff's Response to the Motion for Summary Judgment (Doc. No. 49), the Defendants point out that the Plaintiff failed to attach any affidavits or other evidentiary support to her Response. The Defendants argue that the Plaintiff therefore cannot satisfy her burden of showing that a genuine dispute of material fact exists for trial. However, this Court notes that the Defendants state in their Memorandum in Support of Motion for Summary Judgment (Doc. No. 42) that they accept the Plaintiff's version of the facts as true, for purposes of the summary judgment motion. The Defendants attach as an exhibit to their motion the Plaintiff's Response to Defendants' Interrogatory No. 21, in which the Plaintiff relates her version of the events that occurred on the evening at issue in this case. Deft. Exh. A. The factual allegations made by Plaintiff in her Response are consistent with the allegations contained in her responses to the interrogatories. This Court finds that it may properly consider the Plaintiff's Response to Defendants' Interrogatory No. 21 as evidence supporting the Plaintiff's version of the facts.

II.    BACKGROUND

The Court understands the following to be the pertinent facts that either are undisputed or that favor the Plaintiff in areas of factual dispute. On the evening of September 19, 1997, the Plaintiff went to the Baker Street bar, in Albuquerque, New Mexico, with a friend. The Plaintiff

2

felt "wound-up" and agitated because of sleep deprivation. While at the bar, she dropped her drink and fell when she tried to dance. Deciding to go home, the Plaintiff exited the bar and began to dance across the parking lot toward her car. Albuquerque Police Department Officers Louis Black and Terre Molander, who were standing in the parking lot, heard a voice shout, "Stop her, she's drunk." The officers observed the Plaintiff get into her car, turn on her car engine, and begin to honk her horn. The officers approached the Plaintiff's car and Plaintiff snapped at them, asking them what they wanted. Without telling the Plaintiff to turn off her motor, Officer Black asked the Plaintiff why she was honking the horn, and the Plaintiff responded that she was trying to get her friend's attention. Officer Black pointed out that nobody inside the bar would be able to hear the Plaintiff's horn. Plaintiff failed to explain that her friend might actually be outside of the bar, and instead told the officers, "It's a free country and if I choose to honk my horn in a public parking lot, it's no business of yours."

The officers then requested that the Plaintiff produce her driver's license and car registration, and she complied with the officers' request. The officers retained Plaintiff's license and registration throughout the encounter. However, Plaintiff continued to honk her horn and her car engine was still running. When Officer Black asked her to turn off her car engine, she responded, "Why?". Without answering Plaintiff's question, Officer Black reached into the car to take the keys out of the ignition, and the Plaintiff swatted at his hand. The officers then told the Plaintiff to get out of her car, and they handcuffed her once she was outside. As Officer Molander walked the Plaintiff toward the patrol car, the Plaintiff yelled for help. Officer Molander tried to strap the Plaintiff into the seat belt in the back seat of the police car, and the Plaintiff bit at him. The Plaintiff alleges that from her position in the patrol car, she saw Officer

3

Molander back at her own car, searching through the contents of her purse. She also alleges that she observed both officers rummaging through her car and personal papers within her car.

In the meantime, according to Plaintiff, she grew so frightened of the police officers that she attempted to escape from the patrol car. She became stuck under the protective screen dividing the front and back seats. Plaintiff maintains that when the officers returned to the police car, Officer Molander moved the seat so that Plaintiff could roll out from her stuck position, and that he then shoved her, sprayed mace on her, and touched her repeatedly. The officers drove the Plaintiff to Bernalillo County Detention Center. The Plaintiff was charged with assault, battery, and disorderly conduct. On February 2, 1998, Plaintiff pled guilty to one count of assault and one count of battery. The Plaintiff alleges in her Complaint that the Albuquerque Police Department conducted an internal affairs investigation of Plaintiff's arrest. The investigators concluded that "the evidence supports the allegations brought forth in [Plaintiff's] complaint. Both officers received a Verbal Reprimand and training concerning the areas of probable cause and protective custody."

Plaintiff filed her Complaint on August 31, 2000. The Complaint alleges "violation of Civil and Constitutional Rights under 42 USC 1983-1986," and lists the following specific claims:

> Count #1: Violations of the U.S. Civil and Constitutional Rights under APD, General Orders, "Probable Cause," by definition and in relationship under Title 42, Section 14099.
>
> Count #2: Violations of the U.S. Civil and Constitutional Rights under APD, Procedural Orders, Section 2-11 and 2-48, USC Title 42, Section 14099.
>
> Count #3: Violation of the New Mexico State Constitution, Article II, Sections 10 and 18

> Count #4: Violation of the U.S. Civil and Constitutional Amendments IV, V and XIV.

On February 26, 2001, the Defendants filed a Motion to Dismiss. In a Memorandum Opinion and Order entered April 30, 2001 (Doc. No. 32), this Court granted the motion in part and denied it in part. This Court agreed with the Defendants that the APD should be dismissed as a Defendant, that the Plaintiff had failed to plead facts sufficient to support a claim for punitive damages against the officers, and that attorney's fees are not available to *pro se* litigants. However, this Court did not accept the Defendants' contention that the Plaintiff's constitutional claims were too vague and conclusory.

On August 16, 2001, the Defendants filed a Motion for Summary Judgment, which is the subject of this opinion. The Plaintiff filed her Response (Doc. No. 46) on September 14, 2001. The Defendants point out in their Reply (Doc. No. 49), filed September 28, 2001, that the Plaintiff failed to comply with the August 30, 2001 deadline for responses set by this Court in the Initial Pretrial report. While acknowledging the untimeliness of the Plaintiff's Response, this Court accords greater flexibility to *pro se* parties. Hence this Court, in its discretion, has decided to consider the Plaintiff's Response.

III. DISCUSSION

    A.   <u>Plaintiff's Claims under the Fourth Amendment</u>

This Court begins by analyzing Plaintiff's Fourth Amendment claims, which present much closer questions of facts and law than do her other claims. At the outset, this Court notes that the Defendants have raised an affirmative defense of qualified immunity against the Plaintiff's constitutional claims. Qualified immunity prevents "government officials performing discretionary

functions" from being held liable "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because qualified immunity is "an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), courts approach motions for summary judgment based on qualified immunity differently than other motions for summary judgment.

The United States Supreme Court recently clarified the steps which courts should follow in analyzing qualified immunity defenses, in the context of excessive force claims brought under the Fourth Amendment. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001). To begin, the Supreme Court explained, "[a] court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.*

The Plaintiff contends that by approaching her in the parking lot, questioning her, and reaching into her car to remove her car keys, Officers Black and Molander illegally seized her in violation of the Fourth Amendment. The Defendants appear to concede that the officers' initial encounter with the Plaintiff did constitute a type of seizure. They argue, however, that in detaining the Plaintiff, the officers were not acting in the roles of law enforcement agents investigating crime. Rather, Officers Black and Molander contend they were performing a "community caretaking function," because they were concerned about the Plaintiff's mental state and fitness to operate her car.

The Supreme Court has recognized that local police officers must often "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced

from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). In *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993), the Tenth Circuit observed that in fulfilling community caretaking responsibilities, "a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." The *King* court emphasized, though, that Fourth Amendment protections extend to individuals seized in the course of police officers' exercise of community caretaking functions. The Tenth Circuit explained that "a person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for '[i]t is surely anomalous to say that the individual . . . [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'" *Id.*, quoting *Camara v. Municipal Court*, 387 U.S. 523, 530 (1967).

To evaluate the lawfulness of a detention carried out in a defendant police officer's community caretaking role, the *King* court applied the essential framework set forth in *Terry v. Ohio*, 392 U.S. 1 (1968) for investigative stops based on less than probable cause. 990 F.2d at 1562. The Tenth Circuit noted that "[t]o determine whether an investigative detention . . . is reasonable under the Fourth Amendment, the inquiry is twofold." *King*, 990 F.2d 1552, 1557 (10th Cir. 1993). First, the court must ask whether the officer's conduct was "'justified at its inception.'" *Id.*, quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Second, the court must examine "whether the officer's action is 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.*, quoting *Terry*, 392 U.S. at 20.

Here, this Court finds that Officers Black and Molander were justified in their initial

7

decision to approach and question Ms. West in the parking lot. *Terry* requires that law enforcement officers base such actions on "'specific and articulable facts which . . . reasonably warrant [an] intrusion' into the individual's liberty." *Id.* at 1560, quoting *Terry*, 392 U.S. at 21. In this case, the Defendants have identified a number of facts supporting their stop of the Plaintiff. The officers had seen the Plaintiff walking through the parking lot in an unusual manner, they had heard someone call out that the Plaintiff was drunk, and they had heard the Plaintiff honking her car horn. These observations could reasonably give rise to a concern that the Plaintiff, due to possible intoxication or emotional instability, should not drive away from the parking lot.

Having found that the officers' encounter with the Plaintiff was "reasonable at its inception," this Court turns to the question of whether the encounter "was reasonable as conducted." *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993). This inquiry "must focus on whether the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *King*, 990 F.2d at 1562, quoting *Terry*, 392 U.S. at 21-22. The United States Supreme Court has "cautioned that courts should not indulge in 'unrealistic second-guessing,'" and has "noted that 'creative judge[s], engaged in *post hoc* evaluations of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.'" *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985), quoting *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985).

Addressing the question of reasonableness of scope in the community caretaking context, the *King* court stated, "While police officers are not required to use the least intrusive means in the course of a detention, we must determine whether [the officer's] failure to use less intrusive

means was unreasonable." *King*, 990 F.2d at 1562-63. In this case, this Court finds that Officer Black acted unreasonably in resorting to a fairly invasive measure– reaching inside the Plaintiffs' car to forcibly turn the engine off– instead of considering a range of intermediate measures to accomplish the officers' goal of prolonging their detention of the Plaintiff.

Officer Black stated in his affidavit that he removed the Plaintiff's keys because he had grown "concerned with Plaintiff's safety and the safety of others if she were allowed to drive away." Affidavit of Officer Louis Black, Deft. Exh. C, at 2. However, the Defendants have provided no analysis suggesting why reaching into the Plaintiff's car for her keys, at the point that Officer Black did that, was an appropriate under the circumstances.

First, the Defendants have not established that the officers reasonably perceived a safety concern so pressing that it called for Officer Black to remove the Plaintiff's keys himself. According to the Plaintiff, when Officer Black told her to turn off her car, she simply asked, "Why?" Although not a particularly polite or cooperative response, asking "why?" is not tantamount to refusing to follow an instruction. A reasonable police officer, rather than forging ahead, reaching into Plaintiff's car, and grabbing the Plaintifff's keys, would have provided the explanation that the Plaintiff requested.

As previously mentioned, based on the facts presented by the parties, this Court understands that the Plaintiff's engine was already turned on when the officers approached the Plaintiff's car. It remained on while (1) the officers initially conversed with Plaintiff about why she was honking her horn and the ineffectiveness of doing that; (2) the officers requested Plaintiff's license and registration which Plaintiff retrieved and handed to the officers, who took and kept the documents; (3) Plaintiff continued honking her horn; and (4) Officer Black finally

9

talked to Plaintiff about turning off her car engine and Plaintiff responded by asking "Why?" The officers have pointed to nothing that suggests Officer Black all of a sudden had a reasonable belief that Plaintiff was about to drive away simply because the Plaintiff's car engine was still running, as it had been since the inception of the encounter, and Plaintiff inquired why Officer Black wanted her to turn her motor off at that point. The Court would view this entirely differently if Plaintiff had turned on the ignition shortly before Officer Black asked her to turn the motor off, or if Officer Black had been less cunctatious in making this request. Moreover, it seems that a police officer would not reasonably expect a motorist– who had voluntarily given her driver's license and automobile registration certificate to the officer who was holding them, and who had been engaging in a protracted albeit impolite conversation with the officer– to suddenly depart.

This Court also notes that Victor Valdez, counsel for the Defendants, stated during the October 5, 2001 pretrial conference that the APD reprimanded Officer Black for thrusting his hand through the Plaintiff's window to grab the keys. Departmental regulations apparently prohibit officers from reaching into stopped cars, because suspects could roll up their windows, trapping officers' arms. Although Mr. Valdez made clear that the rule exists to protect officer safety, and not the privacy of suspects, Officer Black should have known when he reached for the Plaintiff's car keys that he was employing a technique disfavored by the APD. For Officer Black to take an action that violated departmental rules, when he could have turned first to much less extreme measures, further indicates that he acted unreasonably.

Before reaching into the Plaintiff's car, Officer Black could have answered Plaintiff's legitimate question and explained why he wanted her to turn her motor off, or the officers could have asked the Plaintiff to exit her vehicle, or they could have repeated their request that she turn

off her engine. In this situation, the action taken by Officer Black was unreasonably intrusive.

Because this Court finds that a violation of the Plaintiff's Fourth Amendment rights took place, "'the next, sequential step is to ask whether the right was clearly established' at the time of the defendant's unlawful conduct." *Holland ex rel Overdorff v. Harrington*, 2001 WL 1251670 at *3 (10th Cir. 2001), quoting *Saucier*, 121 S.Ct. at 2156. "For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as plaintiff maintains." *Foote v. Spiegel*, 118 F.3d 1416, 1424 (10th Cir. 1997). The Tenth Circuit recently pointed out that "[a]s a general proposition, the law that a search or seizure must be objectively 'reasonable' under all the circumstances has been 'clearly established' for a long time." *Holland*, 2001 WL 1251670 at *13, citing *Terry*, 392 U.S. at 21-22 (In Fourth Amendment inquiries, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?")

In particular, the Tenth Circuit has clearly established law concerning seizures taking place in the course of police officers' exercise of their community caretaking role. In *King*, the Tenth Circuit stressed that Fourth Circuit protections extend to individuals seized through community caretaking stops. 990 F.2d at 1560. The Court recognized that, like *Terry* investigatory detentions based on less than probable cause, community caretaking stops must be both reasonable in their inception and reasonable as conducted. *Id.* at 1562.

The Supreme Court emphasized in *Saucier*, though, that courts examining the issue of clearly established rights must consider this question: "whether it would be clear to a reasonable

11

officer that his conduct was unlawful in the situation he confronted." 121 S.Ct. at 2156. An officer's "mistake of law may be 'reasonable' where the circumstances 'disclose substantial grounds for the officer to have concluded he had legitimate justification under the law for acting as he did.'" *Holland*, 2001 WL 1251670 at *13, quoting *Saucier* at 2159-60. The Defendants argue that Officers Molander and Black "were reasonable in their beliefs that their community caretaking functions allowed them to detain Plaintiff." Defendants' Memorandum in Support of Motion for Summary Judgment, at 20. This Court has found that the officers did have valid grounds to approach and detain Plaintiff in the parking lot. However, as discussed above, the question of whether a stop was reasonable at its inception is only half of the two-step inquiry outlined in *King*. A community caretaking detention must also be carried out in a reasonable manner. Here, this Court cannot conclude that a reasonable police officer would believe that he had legitimate justification for reaching into the Plaintiff's car to forcibly turn off her engine. Officer Black's action was out of proportion to what the circumstances merited, to an extent that a reasonable officer would not assume that the action would conform with the standards described in *King*.

Although this Court concludes that the Plaintiff has stated a viable Fourth Amendment

claim with respect to the officers' initial *Terry*-type detention of her,[1] this Court finds that the Plaintiff's other claims under the Fourth Amendment should be dismissed. First, it appears that the Plaintiff may be attempting to challenge the validity of the arrest carried out by the officers after the Plaintiff had swatted at Officer Black's hand. However, once the Plaintiff did this, the officers had probable cause on which to base a formal arrest. The Tenth Circuit has stated that "'[p]robable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'" *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995), quoting *Jones v. City and County of Denver*, 854 F.2d 1206, 1210

---

[1] Plaintiff has presented an analogous claim under the New Mexico Constitution. The courts of the State of New Mexico have recognized that the community caretaker exception is "compatible with the New Mexico Constitution." *State v. Nemeth*, 23 P.3d 936, 946 (N.M. 2001). It is not clear from *Nemeth* whether the protections of Article II, §10 of the New Mexico Constitution are greater or less than those extended by the Fourth Amendment to the United States Constitution, in the context of community caretaking stops. However, the cases cited in the *Nemeth* court's discussion of the community caretaking doctrine stress that police activities carried out under the doctrine must be limited in scope. For example, the court cites *People v. Ray*, 981 P.2d 928, 937 (Cal. 1999) for the proposition that an entry into a private home "'must be suitably circumscribed to serve the exigency which prompted it.'" *Nemeth*, 23 P.3d at 944. This Court hence believes that its finding that Officer Black acted unreasonably in reaching into the Plaintiff's car supports a claim under Article II, § 10, as well as under the Fourth Amendment. This Court therefore finds that the Plaintiff should be able to present to the jury her claim with respect to the officers' initial detention of her under a state constitutional theory, as well as her claim under the Fourth Amendment.

(10th Cir. 1988). Here, the officers had observed the Plaintiff committing an offense.[2] As the Defendants point out, the Plaintiff ultimately pled guilty to one count of assault and one count of battery arising from her encounter with the officers.[3]

Second, the Plaintiff contends that the officers violated her Fourth Amendment rights by searching her "automobile, purse and personal papers, all without 'Probable Cause' or warrant." Complaint (Doc. No. 1), at 2. In their Memorandum in Support of Motion for Summary Judgment, the Defendants maintain that the officers' search of the Plaintiff's car and its contents was a lawful inventory search. Inventory searches fall within "a well-defined exception to the warrant requirement of the Fourth Amendment." *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997), citing *Colorado v. Bertine*, 479 U.S. 367 (1987); *South Dakota v.*

---

[2] This Court's reading of New Mexico state law indicates that the officers also had probable cause to arrest under Article II, § 10 of the New Mexico State Constitution. This Court cannot discern, from the record, the type of battery with which the Plaintiff was charged. Battery on a peace officer is a felony under New Mexico law, NMSA 1978, § 30-22-24. In *Campos v. State*, 870 P.2d 117, 121 (N.M. 1994), the New Mexico Supreme Court stated that "our constitution and case law lead us to hold that for a warrantless arrest to be reasonable the arresting officer must show that the officer had probable cause to believe that the person arrested had committed or was about to commit a felony and some exigency existed that precluded the officer from securing a warrant. If an officer observes the person arrested committing a felony, exigency will be presumed." Further, a police officer may make a warrantless arrest for a misdemeanor offense if the misdemeanor is committed within the officer's presence. See, e.g., *Boone v. State*, 731 P.2d 366, 369 (N.M. 1986).

[3] Certain statements in the Plaintiff's Response to the Defendants' Motion for Summary Judgment suggest that the Plaintiff may be arguing not just that the officers arrested her without probable cause, but also that the officers used excessive force in executing the arrest. See, e.g, Response at 24: "Defendants leave out maceing Plaintiff mericlessly" and "the obsessive touching by Officer Molander although Plaintiff repeatedly asked him to stop." However, even reading the allegations of the Complaint liberally, as is required in cases involving *pro se* plaintiffs, this Court cannot find that the Complaint asserts an excessive force claim under the Fourth Amendment. Rather, the Plaintiff's Fourth Amendment claims described in her Complaint seem limited to claims of improper arrest and improper inventory search.

14

*Opperman*, 428 U.S. 364 (1976). The Tenth Circuit has made clear, though, that "inventory searches are reasonable only if conducted according to standardized procedures." *Id.* New Mexico state constitutional law also permits inventory searches, provided three conditions are met: "1) the vehicle to be inventoried is in police control or custody; 2) the inventory is made pursuant to established police regulations; and 3) the search is reasonable." *State v. Williams*, 642 P.2d 1093, 1095 (N.M. 1982).

The Defendants argue that Officers Black and Molander complied with standardized procedures for inventory searches. Because the Plaintiff was by herself, the officers had no one to whom they could release the car. The officers therefore prepared the car to be towed. Albuquerque Police Department Procedural Order 2-48-2(A) provides that "vehicles will be towed when . . . [t]he driver has been incapacitated, hospitalized, arrested, when the vehicle cannot be released to a responsible party." Deft. Exh. E. Where officers are arranging for a car to be towed, they are to "inventory the entire vehicle, including . . . all sealed and locked containers within." Albuquerque Police Department Procedural Order 2-48-3(C)(1), Deft. Exh. E. The Plaintiff has not identified any particular way in which the officers failed to follow standardized procedures, or any particular way in which the officers' inventory search exceeded bounds of reasonableness. Therefore, the Plaintiff's Fourth Amendment illegal search claim should be dismissed.

B. <u>Plaintiff's Claims under the Fifth Amendment and Article II, § 18</u>

The Defendants maintain that the Plaintiff has failed to articulate a claim under the Fifth Amendment or under Article II, § 18, the analogous provision of the New Mexico state Constitution. This Court agrees with the Defendants' position. The Plaintiff relies on the Fifth

15

Amendment to argue that she was deprived of due process in entering her guilty plea and to argue that Officer Molander has made defamatory statements about her, but the Plaintiff's Fifth Amendment theories are very unclear and do not seem to relate to the core facts and claims that are the focus of this case. Even given that "[a] pro se litigant's pleadings are to be construed liberally," *Hall v. Bellman*, 935 F.2d 1106, 1110 (10th Cir. 1991), this Court believes that the Plaintiff has not set forth any Fifth Amendment claim, or Article II, § 18 claim, with sufficient clarity to survive the Defendants' motion for summary judgment. These claims should therefore be dismissed.

### C. Counts I and II

The Defendants argue that this Court should dismiss Counts I and II of the Plaintiff's Complaint for failure to state a claim. Count I asserts that the Defendants committed "[v]iolations of the U.S. Civil and Constitutional Rights under APD, General Orders, "Probable Cause," by definition and in relationship under Title 42, Section 14099," while Count II asserts "[v]iolations of the U.S. Civil and Constitutional Rights under APD, Procedural Orders, Section 2-11 and 2-48, USC Title 42, Section 14099." Neither 42 U.S.C. § 14099 nor the General and Procedural Orders of the Albuquerque Police Department can support private causes of action.

First, 42 U.S.C. § 14099 relates to the federal Police Corps program. Section 14099 outlines the requirements with which states taking part in the police corps program must comply. The Plaintiff emphasizes that under 42 U.S.C. § 14099(8), a state's Police Corps plan must "ensure that participants will receive effective training and leadership." However, this provision does not represent a means through which plaintiffs may sue police officers or municipalities for alleged deficiencies in police training programs. Second, as the Defendants point out, the Plaintiff

16

cannot base claims on her allegations that the Defendant police officers violated Albuquerque Police Department general and procedural orders. In her Response to the Defendants' Motion for Summary Judgment, Plaintiff cites *Valez v. City of London*, 903 F.Supp. 286 (D.Conn. 1995), an opinion which notes that a municipality's failure to provide adequate police training may give rise to 42 U.S.C. § 1983 liability. However, in this case the Plaintiff seem to contend that the Defendant police officers failed to follow established APD policies– not that the officers' conduct stemmed from flawed APD policies.

        D.      <u>Plaintiff's Claims under 42 U.S.C. § 1985 and 42 U.S.C. § 1986</u>

The Defendants argue that the Plaintiff has failed to state a claim under 42 U.S.C. § 1985 and 42 U.S.C. § 1986. Section 1985(3) sets out a cause of action against parties who "conspire . . . for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws." Here, the Defendants contend, the Plaintiff has not alleged any facts indicating that the Defendants engaged in a conspiracy to deny her of equal protection. In particular, the Defendants stress that the Plaintiff has not shown that the Defendants engaged in wrongful acts that were motivated by class-based animus, as required under such cases as *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). In addition, § 1986 claims apply against parties who have failed to prevent § 1985 violations. The Defendants maintain that the Plaintiffs would be able to assert a § 1986 claim only if she could state a cause of action under § 1985.

In her Response, the Plaintiff does not specifically address the Defendants' arguments concerning 42 U.S.C. § 1985 and 42 U.S.C. § 1986. This Court, in reviewing the Plaintiffs' Complaint, has not found any allegations which seem to provide a basis for claims under § 1985 and § 1986. Therefore, any claims that the Plaintiff wishes to pursue under these provisions

should be dismissed.

E. <u>Municipal liability</u>

The Plaintiff's Complaint names the City of Albuquerque as a Defendant. In their Motion for Summary Judgment, the Defendants argue that the City should be dismissed as a Defendant. Liability under 42 U.S.C. § 1983 extends to municipalities "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Plaintiff has not established any causal connection between the City of Albuquerque and her alleged injury. In fact, Plaintiff seems to argue instead that Officer Black's and Officer Molander's failure to adhere to city policies contributed to her alleged injury. Thus, the City of Albuquerque should be dismissed as a Defendant.

IT IS THEREFORE ORDERED that the Defendants' Motion for Summary Judgment:

(1) will be denied with respect to the Plaintiff's claim that the Officer Black and Molander's initial detention of her constituted an improper seizure in violation of the Fourth Amendment and Article II, § 10 of the New Mexico State Constitution; and

(2) will be granted as to the following:

a. The Plaintiff's claims under the Fourth Amendment of the United States Constitution and Article II, § 10 of the New Mexico State Constitution that the Defendant police officers improperly arrested her after she had swatted at Officer Black;

b. The Plaintiff's claims under the Fourth Amendment of the United States

        Constitution and Article II, § 10 of the New Mexico State Constitution that

        Defendant police officers improperly searched her car and belongings;

c.        The Plaintiff's claims under the Fifth Amendment of the United States Constitution and under Article II, § 18 of the New Mexico State Constitution;

d.        The Plaintiff's claims in Counts I and II of her Complaint, made under 42 U.S.C. § 14099 and Albuquerque Police Department General and Procedural Orders;

e.        Any claims which the Plaintiff may be asserting under 42 U.S.C. §§ 1985 and 1986; and

f.        All claims against Defendant City of Albuquerque.

_____
CHIEF UNITED STATES DISTRICT JUDGE

19